Filed 3/11/24  In re Jeremy R. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re JEREMY R. et al., Persons Coming Under the Juvenile Court Law. | B329305 |
| | (Los Angeles County Super. Ct. No. 18CCJP06458 A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CHRISTOPHER R., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Juvenile Court Referee. Conditionally affirmed and remanded with instructions.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

———————————

## INTRODUCTION

Christopher R. appeals from the juvenile court's order terminating his parental rights over Jeremy R. (born 2016), and twins Angel R. and Jordan R. (born 2021) under Welfare and Institutions Code section 366.26.[1] Christopher's sole contention on appeal is that the Los Angeles County Department of Children and Family Services (the Department) and the juvenile court failed to comply with the initial inquiry requirements of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California law.

Christopher argues the Department failed to interview the children's maternal grandfather, paternal aunt and great-aunt, and maternal aunt and uncle as to the children's possible Indian ancestry, and the court prejudicially erred in finding without a further inquiry that ICWA did not apply. The Department argues it thoroughly inquired about Indian ancestry from the paternal great-grandmother, the paternal great-grandfather, the paternal grandfather, the paternal grandmother, the maternal grandmother and the maternal great-grandmother, and

---

[1] All undesignated statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

contacted several relevant tribes and agencies which indicated the children were not Indian children. Thus, the Department contends substantial evidence supports a finding that ICWA does not apply to the children and any error in failing to interview additional extended family members was harmless.

We agree with Christopher the juvenile court and the Department failed to comply with the inquiry requirements of ICWA and related California law. We consider such error prejudicial and reversible because the relatives he identifies were readily available and information they had was likely to be meaningful in determining whether Jeremy, Angel, and Jordan are Indian children. In particular, information from the maternal grandfather was likely to be meaningful and not duplicative of information available from the other relatives interviewed. Accordingly, we conditionally affirm the court's order terminating Christopher's parental rights and remand the matter to allow the Department and the juvenile court to comply with the inquiry and notice provisions of ICWA and California law.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Dependency Proceedings*

On October 10, 2018 the Department filed its underlying juvenile dependency petition regarding Jeremy. The Department alleged pursuant to former section 300, subdivisions (a) and (b), that the parents had a history of engaging in domestic violence in Jeremy's presence and histories of substance abuse, and that they were current abusers of amphetamine, methamphetamine,

3

and marijuana.[2] At the detention hearing on October 11, 2018 the juvenile court found a prima facie case for detaining Jeremy and ordered him detained in foster care. Jeremy was placed with his paternal great-grandmother, Audrey. The court found Christopher to be Jeremy's presumed father.

On March 4, 2019 at the jurisdiction and disposition hearing, Christopher and S.G., Jeremy's mother, executed waivers of rights and agreed to plead no contest to the petition. The juvenile court sustained the petition after amending it by interlineation to strike the a-1 domestic violence count, to alter and remove certain language regarding the b-1 domestic violence count, and to edit the b-2 and b-3 counts relating to substance abuse to state that the parents were recent, rather than current, substance abusers. The court declared Jeremy a dependent of the juvenile court, removed him from parental custody, and ordered reunification services for both parents.

At the six-month review hearing on October 15, 2019 the juvenile court found the Department had provided the parents with reasonable reunification services and ordered services continued. At the 12-month review hearing on September 17, 2020 the juvenile court found the Department had provided the parents with reasonable reunification services, and the parents' compliance with their case plans had not been substantial. The court terminated reunification services for both parents and set

---

[2] Section 300 was amended effective January 1, 2023, after the juvenile court issued its jurisdiction findings in this case. (Stats. 2022, ch. 832, § 1.) The amendments do not impact our analysis.

4

the case for a selection and implementation hearing under section 366.26.

On March 18, 2021 the juvenile court identified adoption as a specific goal for Jeremy.

On June 2, 2021, shortly after Angel and Jordan were born, the Department filed its underlying juvenile dependency petition regarding the newborn twins pursuant to former section 300, subdivisions (a), (b)(1), and (j). The Department alleged the parents had a history of engaging in verbal and physical altercations in the presence of their older sibling Jeremy, resulting in Jeremy becoming a dependent of the juvenile court; Angel and Jordan were born with positive toxicology screenings for amphetamine; and the parents had a history of substance abuse, with current use by S.G. and recent use by Christopher. On June 4, 2021 the juvenile court found a prima facie finding for detaining Angel and Jordan and ordered them detained in hospital care.

On September 2, 2021 the juvenile court again identified adoption as a specific goal for Jeremy.

On September 27, 2021 the juvenile court sustained the petition regarding Angel and Jordan as to the b-3 and b-4 counts relating to the parents' substance abuse and the j-3 count regarding parental altercations in Jeremy's presence, dismissed the remaining counts, and ordered the matter continued for disposition.

The juvenile court ordered a bonding study regarding Christopher and Jeremy on November 8, 2021, and continued Jeremy's section 366.26 selection and implementation hearing.

On January 31, 2022 the juvenile court declared Angel and Jordan dependents of the court and removed them from parental

5

custody, bypassed the parents for reunification services pursuant to section 361.5, subdivision (b)(10), and ordered the matter set for hearing under section 366.26.

On March 14, 2022 the juvenile court identified adoption or guardianship as a specific goal for Jeremy. The juvenile court modified that goal on August 1, 2022 to placement in foster care with a permanent plan of adoption and selected the same plan as a specific goal for Angel and Jordan.

At the selection and implementation hearing on April 24, 2023 the court found all three children adoptable and that no exception to the statutory preference for adoption applied, terminated the parental rights of S.G. and Christopher, and ordered the children placed for adoption with maternal grandmother Angela.

Christopher timely appealed on April 24, 2023.

B.      *The Department and Juvenile Court's ICWA-related Actions*
At the time it filed the petition on behalf of Jeremy, the Department attached the required ICWA-010(A) form, dated October 9, 2018, indicating inquiry had been made and Jeremy had no known Indian ancestry. ICWA-020 forms signed by both parents and filed on October 11, 2018 indicated Christopher and S.G. each had no Indian ancestry as far as they knew. On October 11, 2018 the juvenile court found ICWA did not apply to the case.

On November 16, 2018, Christopher told a social worker he had Native American ancestry through his father, paternal grandfather Desmon. Paternal great-grandmother Audrey told a social worker on November 18, 2018 that she had Choctaw ancestry.

6

On November 29, 2018 S.G. told a social worker her father, maternal grandfather Stephen, had Blackfeet and Cherokee ancestry.

On January 14, February 6, and March 4, 2019 the Department submitted return receipts and responses received from several tribes stating Jeremy was not a member or eligible for membership, including from the Eastern Band of Cherokee Indians; the Choctaw Nation of Oklahoma; the Blackfeet Tribe of Montana; the Mississippi Band of Choctaw Indians; the Jena Band of Choctaw Indians; the Cherokee Nation; and United Keetoowah Band of Cherokee Indians.

On March 4, 2019 the juvenile court again found ICWA did not apply.

At the time it filed the petition on behalf of Angel and Jordan, the Department attached the required ICWA-010(A) form, dated June 1, 2021, indicating a social worker interviewed the parents and had no reason to believe the twins were Indian children. ICWA-020 notices signed by both parents and filed June 3, 2021 indicated the twins had no Indian ancestry. On June 4, 2021 the juvenile court found ICWA did not apply as to Angel or Jordan.

On August 1, 2022 the juvenile court ordered the Department to conduct and document a full ICWA inquiry.

The Department interviewed maternal great-grandmother Beverly (mother of Stephen), who reported she may have Cherokee and Blackfeet heritage through her own paternal great-grandmother. Beverly was not able to provide a name of that ancestor or other vital information. Stephen was not interviewed, and the record reflects no attempt to contact him or explanation why he was not interviewed. Stephen's father,

7

Norman, was not interviewed; the ICWA-030 form indicates it was unknown whether he was alive or deceased.

The Department interviewed paternal great-grandmother Audrey, who indicated she had Choctaw ancestry through her grandmother, but did not have her grandmother's birthdate or know of other people with knowledge regarding that ancestry. Paternal great-grandfather Joe told a social worker he had heard his grandmother was Native American, but that he did not know what tribe. He reported his son, paternal grandfather Desmon, was Choctaw and receiving services through Rio Hondo. On August 11, 2022 paternal grandfather Desmon was interviewed and stated he was not registered with the Choctaw tribe.

The Department also interviewed maternal grandmother Angela and paternal grandmother Rose, who denied Indian ancestry.

On November 28, 2022 the juvenile court ordered the section 366.26 selection and implementation hearing for all three children continued for further ICWA updates from the Department, and ordered the Department to verify and correct paternal grandfather Desmon's birth date and full name in its notice to the Choctaw Nation.

On January 30, 2023 the juvenile court ordered the matter continued for further receipt of ICWA responses.

On March 9, 2023 the Department reported it had inquired further from Christopher and was told he had no additional information. S.G.'s whereabouts were unknown. Paternal great-grandmother Audrey and maternal great-grandmother Beverly also reported they had no additional information.

On March 27, 2023 the juvenile court ordered the matter continued for receipt of one outstanding ICWA response.

In all, the Department received responses that the children were not members or eligible members for ICWA purposes from the Choctaw Nation of Oklahoma, the Cherokee Nation, the Blackfeet Nation, the United Keetoowah Band of Cherokee Indians, and the Eastern Band of Cherokee Indians.

On April 24, 2023 the juvenile court found, without objection from any party, that ICWA did not apply to this case.

## DISCUSSION

A.    *ICWA and the Duties of Inquiry and Notice*

ICWA and governing federal regulations (25 C.F.R. § 23.101 et seq. (2023)) set minimum federal standards a state court must follow before removing Indian children from family and placing them in foster care or adoptive homes.  (*In re Y.W.* (2021) 70 Cal.App.5th 542, 551; accord, *In re T.G.* (2020) 58 Cal.App.5th 275, 287; see 25 U.S.C. § 1902.)  The statute "authorizes states to provide 'a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under' ICWA."  (*In re T.G.,* at pp. 287-288; see 25 U.S.C. § 1921.)  In addition to significantly limiting state court actions concerning out-of-family placements for Indian children (see *In re T.G.,* at pp. 287-288), ICWA permits tribes to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding (see 25 U.S.C. § 1911(c); *In re Isaiah W.* (2016) 1 Cal.5th 1, 8).

To ensure Indian tribes have the opportunity to exercise their rights in dependency proceedings, an investigation of a family member's belief a child may have Indian ancestry must be undertaken and notice provided, where appropriate, to the

9

relevant tribes.  (See § 224.2, subdivision (a) [imposing on the court and child protective services agencies "an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child."].)  "The continuing duty to inquire whether a child is or may be an Indian child 'can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.'"  (*In re Y.W., supra,* 70 Cal.App.5th at p. 552; accord, *In re Antonio R.* (2022) 76 Cal.App.5th 421, 429.)

The duty to inquire "'begins with initial contact (§ 224.2, subd. (a)) and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child.'"  (*In re Rylei S.* (2022) 81 Cal.App.5th 309, 316; § 224.2, subds. (a)-(c).)  The duty of inquiry also extends to the juvenile court, which is required to "ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child."  (§ 224.2, subd. (c); see also 25 C.F.R. § 23.107(a) ["[s]tate courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child"]; *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742.)

The Department's initial duty of "[i]nquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child."  (§ 224.2, subd. (b); see Cal. Rules of Court, rule 5.481(a)(1) [the Department "must ask the child, if the child is old enough, and

the parents, Indian custodian, or legal guardians, extended family members, others who have an interest in the child, and where applicable the party reporting child abuse or neglect, whether the child is or may be an Indian child"]; *In re Y.W., supra,* 70 Cal.App.5th at pp. 551-552.)  ICWA and state law define "extended family member," if not separately defined by the law or custom of the Indian child's tribe, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent."  (25 U.S.C. § 1903(2); see Welf. & Inst. Code, § 224.1, subd. (c) [providing "extended family member" follows definition stated in ICWA].)

The duty of further inquiry is triggered if the juvenile court or the Department "has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child."  (§ 224.2, subd. (e); Cal. Rules of Court, rule 5.481(a)(4); *In re Y.W., supra,* 70 Cal.App.5th at p. 552.) That further inquiry requires interviewing, "as soon as practicable," extended family members, contacting the Bureau of Indian Affairs and contacting "the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility."  (§ 224.2, subd. (e) & (e)(2)(C)); see also rule 5.481(a)(4).)

If the further inquiry "results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply."  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052; see 25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3,

11

subd. (a) [notice under ICWA "shall be provided" if the court, social worker, or probation officer "knows or has reason to know . . . that an Indian child is involved"].)

"'The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families.'" (*In re Rylei S., supra,* 81 Cal.App.5th at p. 317; accord, *In re Benjamin M., supra*, 70 Cal.App.5th at p. 742 ["the agency has a duty to gather information by conducting an initial inquiry, where the other party—here a parent . . . has no similar obligation"].)

"[I]n determining whether the failure to make an adequate initial inquiry is prejudicial, we ask whether the information in the hands of the extended family members is likely to be meaningful in determining whether the child is an Indian child, not whether the information is likely to show the child is in fact an Indian child. In most circumstances, the information in the possession of extended relatives is likely to be meaningful in determining whether the child is an Indian child—regardless of whether the information ultimately shows the child is or is not an Indian child." (*In re Antonio R., supra,* 76 Cal.App.5th at p. 435, see *In re Rylei S., supra,* 81 Cal.App.5th at p. 325 ["the failure to fully comply with a mandatory duty may be harmless error, so long as the record affirmatively reflects that the protections intended to be afforded through the exercise of that duty have been provided"]; see also *In re Benjamin M., supra,* 70 Cal.App.5th at p. 744 ["in ICWA cases, a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates

12

that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child"].)

2. *The Department Failed To Comply Fully with Its Duty of Inquiry Under Section 224.2, Subdivision (b)*

As discussed, the Department had a duty pursuant to section 224.2, subdivision (b), to ask not only the parents, but also extended family members whether the children had possible Indian ancestry.

Christopher identifies the following available relatives likely to have information bearing on the children's ancestry, but who were not asked: maternal grandfather Stephen; paternal aunt Nvelyn and paternal great-aunt Merel, who were each interviewed by a social worker on October 1, 2018 but were not asked about any possible Indian ancestry; and maternal uncle Aaron and maternal aunt Omega (S.G.'s half-siblings and children of the maternal grandmother).[3]

---

[3] Christopher also mentions his minor half-sister Abigail (i.e., the paternal aunt) "who is now [at the time of appellate briefing] approximately thirteen or fourteen years old." To the extent Christopher suggests the Department should have interviewed his minor half-sister, she does not fall within the statutory definition of extended family because she has not reached age 18 and Christopher makes no argument that tribal law or custom dictates otherwise. (See 25 U.S.C. § 1903(2) [extended family member for ICWA inquiry purposes must be "a person who has reached the age of eighteen" unless otherwise defined by tribal law or custom]; Welf. & Inst. Code, § 224.1, subd. (c) [providing "extended family member" follows definition stated in ICWA].)

As detailed above, the Department's reports confirm its social workers or investigators contacted and inquired about Indian ancestry from the paternal grandfather, the paternal grandmother, the paternal great-grandmother, the paternal great-grandfather, the maternal grandmother (mother of S.G., Aaron, and Omega) and the maternal great-grandmother (mother of Stephen).

Section 224.2, subdivision (b), does not establish an absolute (and often impossible) standard mandating that every living extended family member be interviewed. What is required, however, is that the Department interview all known and available maternal and paternal extended family members and make reasonable efforts to identify and thereafter to interview any other extended family members, as well as other individuals who have an interest in the child, regarding the child's possible Indian ancestry. Here, although we do not suggest the Department did not make a dedicated effort to determine Indian ancestry, its efforts did not fulfill its statutory obligation.

Specifically, the Department did not interview, or make any showing of reasonable efforts to contact and interview, the maternal grandfather, Stephen, despite the fact that S.G. told a social worker she had Blackfeet and Cherokee ancestry through Stephen, her father, and that she had a good relationship with him.

In addition, although the Department interviewed paternal aunt Nvelyn and paternal great-aunt Merel on October 1, 2018, it made no inquiry of either of them regarding Indian ancestry. And, there is no indication that maternal uncle Aaron and maternal aunt Omega were ever interviewed about Indian ancestry, although S.G. reported she was very close with them

14

and a social worker reported "Jeremy has a maternal Aunt and Uncle who love to buy him things and spoil him."

While it made a concerted attempt to determine the children's possible Indian ancestry and notify relevant tribes, the Department did not satisfy its duty of inquiry under section 224.2, subdivision (b). (See, e.g., *In re M.B.* (2022) 80 Cal.App.5th 617, 629-630 [Department did not conduct adequate inquiry into child's possible Indian ancestry prior to terminating parental rights because it failed to contact the child's maternal grandmother, did not determine whether the maternal grandfather was available for an interview, and did not ask ICWA-related questions of a maternal great-aunt who had been identified as the child's prospective adoptive parent]; see also *In re Jayden G.* (2023) 88 Cal.App.5th 301, 311 [Department failed to ask maternal and paternal extended family members about their Indian ancestry despite having contact with maternal grandmother and maternal cousin and information about paternal grandfather's residence].)

This error is not harmless. As we have consistently held, because we do not know what information these relatives might have, prejudice is established when the record reflects that information from extended family members who were not contacted is "likely to be meaningful in determining whether the children involved were Indian children—whether the information ultimately showed they were or established they were not." (*In re Rylei S., supra,* 81 Cal.App.5th at p. 324; accord, *In re Antonio R., supra,* 76 Cal.App.5th at p. 435 ["Where the Department fails to discharge its initial duty of inquiry under ICWA and related California law, and the juvenile court finds ICWA does not apply notwithstanding the lack of an adequate inquiry, the error is in

15

most circumstances, as here, prejudicial and reversible. Speculation as to whether extended family members might have information likely to bear meaningfully on whether the child is an Indian child has no place in the analysis of prejudicial error where there is an inadequate initial inquiry."].)

That standard of prejudice is satisfied here. Although S.G. indicated her father Stephen had Blackfeet and Cherokee ancestry, the record contains no indication the Department ever interviewed him or made any attempts to contact him. Nor did the juvenile court direct the Department to attempt to contact Stephen. Responses from Stephen, the children's maternal grandfather, would have provided meaningful information with which to assess S.G.'s assertion of possible tribal ancestry.

That the Department inquired of Stephen's mother Beverly, the children's maternal great-grandmother, does not change this conclusion. Beverly would not necessarily possess the same information as Stephen regarding his ancestry, particularly with regard to Stephen's paternal lineage. No one in Stephen's paternal line provided any information: Stephen's father Norman, the maternal great-grandfather, was not interviewed and the record contains no indication the Department made any attempts to contact him. (The ICWA-030 form provided no date of birth or other vital information about Norman beyond his name, and stated it was unknown whether he was deceased.)

Nor does the fact that notice was provided to Blackfeet and Cherokee tribes affect our conclusion. S.G.'s belief that Stephen had Blackfeet and Cherokee ancestry does not mean that her information was accurate in the absence of interviewing him directly; without interviewing Stephen it is impossible to know

16

whether he would confirm S.G.'s information, deny it, or claim ancestry from another tribe or tribes altogether. As discussed, the Department's obligation to interview extended family members is not dependent on a parent's statement of Indian ancestry. (See *In re Rylei S., supra,* 81 Cal.App.5th at p. 317 ["'The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families.'"]; accord, *In re Benjamin M., supra,* 70 Cal.App.5th at p. 742 [parent "has no similar obligation" as agency to gather information about ancestry].)

Moreover, Stephen's full and correct information was apparently not provided to the identified tribes and agencies in any event: his birth year was missing from the ICWA-030 notice. Although the juvenile court ordered the Department to verify and correct a similar omission (incorrect birthday and incomplete name) as to the paternal grandfather in its notice to the Choctaw Nation and continued the section 366.26 hearing on this basis, the record reflects no similar effort by the court with regard to verifying or correcting Stephen's vital information. This notice error must be corrected on remand as well.

Because we conclude the failure to interview Stephen was not harmless, we need not additionally determine whether the Department's failure to interview the additional available relatives identified by Christopher was also harmless given its inquiry of other extended family members.[4]

---

[4] Although initial inquiry error "is in most circumstances, as here, prejudicial and reversible" (*In re Antonio R., supra,* 76 Cal.App.5th at p. 435), we do not suggest that harmless error

17

On remand the Department must make an initial inquiry of the identified relatives meeting the statutory definition of an "extended family member," including the children's maternal grandfather Stephen, paternal aunt Nvelyn, paternal great-aunt Merel, maternal uncle Aaron, and maternal aunt Omega. (See 25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c).) Christopher does not contend there are other extended family members over the age of 18 whom the Department needs to contact.

## DISPOSITION

The orders terminating parental rights are conditionally affirmed. The matter is remanded to the juvenile court to ensure the Department complies fully with the inquiry and notice provisions of ICWA and related California law. If the court finds Jeremy, Angel, and Jordan are Indian children, it shall conduct a new section 366.26 hearing, as well as all further proceedings, in

---

may never be found. In *In re Rylei S., supra,* 81 Cal.App.5th at page 325, responding to the Department's mischaracterization of our prior decisions as holding that any ICWA-related inquiry error, no matter how trivial, required an automatic reversal, we described a hypothetical situation in which the agency's failure to contact all of a child's close relatives would not require a remand. We provided the following hypothetical: "The child protective agency interviews the maternal grandfather; several, but not all of his four siblings; and the maternal grandfather's surviving parent, none of whom indicates the family has any Indian ancestry." (*Id.* at p. 325.) The failure to interview the grandfather's remaining siblings, we said, "would certainly be harmless absent some additional unusual circumstance." (*Ibid.*)

18

compliance with ICWA and related California law.  If not, the court's original section 366.26 orders will remain in effect.


MARTINEZ, J.

We concur:


SEGAL, Acting P. J.


FEUER, J.